UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| KIMBERLY YVONNE BESSONG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | 1:11-cv-01239-RLY-DML |
| EXEL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Kimberly Yvonne Bessong, is a former employee of Exel, Inc., who held the position of utility housekeeper. During her employment at Exel, she learned she was HIV positive. In her Second Amended Complaint, she alleges that Exel violated the confidentiality provision of the Americans With Disabilities Act ("ADA"), and that Exel discriminated against her in violation of the ADA. Plaintiff also alleges that Exel retaliated against her for filing charges with the Equal Employment Opportunity Commission ("EEOC") and for filing the present lawsuit, in violation of Title VII of the Civil Rights Act of 1964. Exel now moves for summary judgment. For the reasons set forth below, its motion is **GRANTED**.

**I.    Background**

Exel operates a return center for Wal-Mart on Franklin Road in Indianapolis. (Deposition of Kent Perry ("Perry Dep.") at 7). Plaintiff began her employment with Exel on July 27, 2004, as a module operator. (Deposition of Kimberly Bessong

1

("Plaintiff Dep.") at 14). In 2007, Plaintiff transitioned to a housekeeping position, where she cleaned restrooms, administrative offices, break rooms, and locker rooms. (*Id*. at 59). In the fall of 2010, Plaintiff transferred to the position of utility cleaner, where she was responsible for maintaining the cleanliness of Exel's Franklin Road warehouse. (*Id*. at 56-57, 62-63).

### A. Request for FMLA

In April 2010, Plaintiff requested leave pursuant to the Family Medical Leave Act ("FMLA"). (*Id*. at 185). At that time, she had not received a diagnosis for her medical condition. (*Id*. at 192). Plaintiff's healthcare provider's certification form, submitted to Exel in support of her request for FMLA, did not identify the particular medical condition or diagnosis; it merely provided a general description of her symptoms and stated that the condition's duration was "lifetime." (*Id*. at 189; Plaintiff Dep. Ex. 22). Mark Wittenauer, who served as the Exel facility's Human Resources Manager at that time, approved Plaintiff's request. (Plaintiff Dep. at 190).

After he approved Plaintiff's request for FMLA leave, on June 1, 2010, Wittenaur sent an email to Office Manager Angela Winebrenner and Winebrenner's assistant (whose responsibilities included monitoring employee attendance), and to Operations Manager Eric Fike (who supervised Plaintiff at the time), notifying them that Plaintiff had been diagnosed with a lifelong illness requiring intermittent FMLA leave going forward. (Deposition of Mark Wittenaur ("Wittenaur Dep.") at 9-11, 14; Plaintiff Dep. Ex. 47).

In late June 2010, Plaintiff approached Wittenauer and informed him she was HIV-positive. (Plaintiff Dep. at 135; Wittenaur Dep. at 9). Plaintiff wanted his advice on how to handle the situation with co-workers. (Plaintiff Dep. at 146-51).

### B. Plaintiff's Complaints

On September 18, 2010, Plaintiff called the employee hotline number to complain about certain events at work. (Affidavit of Kimberly Yvonne Bessong ("Plaintiff Aff."), Ex. 1). For example, at a safety meeting in July 2010, Safety Director Shawn Morgan discussed the symptoms of HIV, and told Plaintiff that she was at a higher risk for contracting the disease since she worked in housekeeping. (*Id.*). In addition, in September 2010, Fike, among others, would not allow her to leave work even though Plaintiff's daughter informed her there was a fire at her apartment complex. (*Id.*).

On January 6, 2011, and April 22, 2011, Plaintiff filed charges of discrimination against Exel with the EEOC. Plaintiff's January 2011 charge alleged that Wittenauer violated the ADA by disclosing her medical condition to Morgan, among others, and that she had been subjected to disparate treatment following said disclosure. (Second Amended Compl., Ex. A). Wittenauer testified he was aware of that filing in January 2011. (Wittenauer Dep. at 14). He transferred to Exel's Mooresville facility not long thereafter. (*Id.* at 6). Plaintiff's April 2011 charge alleged that two of her supervisors, shift supervisor Robert Thomas and the company's former Operations Manager, Doug Kimbrough, "placed extra job requirements" on her not required of her co-worker, Polly Fowler. (Second Amended Compl., Ex. C).

On September 14, 2011, Plaintiff filed her original *pro se* Complaint in this case, alleging a "violation of employee & employer confidentiality during 'safety meeting' by supervisor." (Plaintiff Dep. at 220-21).

On October 17, 2011, Judith Johnson replaced Wittenauer as Human Resources Manager at the Franklin Road facility. (Affidavit of Judith Johnson ("Johnson Aff.") ¶ 2).

### C. Corrective Action Notices

Pursuant to Exel's Policies and Procedures Manual, an employee who accumulates eight "occurrence points" from absences, late arrivals, or early departures in a given year, is subject to termination. (*Id.*, Ex. A). According to Exel's attendance policy, an employee who arrives between 1-15 minutes late receives .25 points; an employee who arrives 16 minutes-2 hours late receives .5 points. (*Id.*). On October 25, 2011, Plaintiff left early from work, resulting in an attendance-point total of 7.5. (*Id.* ¶ 5). Exel issued Plaintiff a Corrective Action Notice for Attendance Issues, which notified her of her total points, and warned her that reaching eight attendance points would result in dismissal from employment. (*Id.*, *see also id.*, Ex. B). Plaintiff signed the Corrective Action Notice on October 31, 2011. (*Id.*, Ex. B).

In addition, on November 23, 2011, Plaintiff received a first written warning and a second written warning, on a form entitled Corrective Action Notice, for violating Exel's General Behavior Rules. The first written warning was actually an amendment to a final written warning for taking a break 10 minutes before her scheduled break on December 22, 2010. (Plaintiff Dep. Ex. 48). The second written warning was issued because, on

4

November 17, 2010, Plaintiff was observed on a surveillance video (discussed below) talking to another associate in the supply room for 36 minutes during her scheduled shift. (*Id.*).

### D. Events Leading to Plaintiff's Termination

On November 28, 2011, Plaintiff was scheduled to work her normal shift beginning at 5:00 p.m. (Johnson Aff. ¶ 6). Plaintiff did not arrive on time, and did not clock in. (Deposition of Angela Winebrenner ("Winebrenner Dep.") at 42; Plaintiff Dep. at 171).

The Franklin Road Wal-Mart facility where Plaintiff worked has a video surveillance system stationed at the door that Plaintiff used to enter the facility that day. (Affidavit of Austin Davisson ("Davisson Aff.") ¶ 5). According to Exel's Asset Safety and Security Manager, Austin Davisson, the purpose of the system is to prevent product theft, and to determine the actual arrival time of Exel employees who arrive late to work or who forget or neglect to clock in. (*Id.*; *see also* Wittenauer Dep. at 17-18 (testifying that he viewed video when employees arrived late to determine arrival time)). At Johnson's request, and in the presence of Perry, Davisson scanned back the video to the point in time Plaintiff arrived to work. (Davisson Aff. ¶ 4). According to the time superimposed on the video screen, the video showed Plaintiff arriving more than 15 minutes late to work. (*Id.*). The three compared the time on the video screen to the time displayed by Exel's time clock (the Kronos time clock system), and found both times to be the same. (*Id.*). This time differed from the time logged in on the Leave Early or Late Log recorded by Asset Protection at the entrance she used that day. According to that

5

Log, she entered the building at 5:14 p.m. (Plaintiff Dep. Ex. 45). Plaintiff's Missed Punch Form also reflected that she arrived at 5:14 p.m. (*Id*.).

Following Plaintiff's arrival to work, Human Resources Manager Johnson approached Plaintiff and told her that the video showed Plaintiff arriving at 5:20 p.m. (Plaintiff Dep. at 20). Johnson and Perry walked Plaintiff to the facility's exit. (*Id*. at 21; Johnson Aff. ¶ 8; Affidavit of Kent Perry ("Perry Aff.") ¶ 7). Johnson and Perry then conferred with Exel's General Manager, Larry Morton, regarding Plaintiff's accumulation of eight attendance points, and they all agreed that termination of Plaintiff's employment was warranted. (Johnson Aff. ¶ 8; Perry Aff. ¶ 8; Affidavit of Larry Morton ("Morton Aff.") ¶ 6). The next morning, Perry told Winebrenner to change the Log and Plaintiff's clock-in time to reflect 5:20 p.m. (Winebrenner Dep. at 57-58).

Davisson testified that following Plaintiff's termination, he tried to download the video of Plaintiff as she entered the facility on November 28, 2011. (Davisson Aff. ¶ 8). His attempts failed, as "the video writes over itself after approximately 30 days." (*Id*. ¶¶ 7-8). The surveillance video of Plaintiff talking to another co-worker during her break, which was the subject of her Corrective Action Notice dated November 23, 2011, was also not kept because, according to Perry, the video "does not archive." (Perry Dep. at 43).

Plaintiff's third and final charge, in which Plaintiff alleged discriminatory and retaliatory discharge, was filed on January 26, 2012. (Second Amended Compl., Ex. E).

### E. Exel's Knowledge

Plaintiff did not inform anyone at Exel that she had filed charges of discrimination or a federal lawsuit. (Plaintiff Dep. at 123-24, 194-95, 222). In addition, Plaintiff did not provide a copy of her charges or her federal court Complaint to anyone at Exel. (*Id*. at 123, 194, 221). Moreover, at the time of Plaintiff's termination on November 28, 2011, neither Johnson, Perry, Morton, nor Davisson were aware that Plaintiff had filed a charge of discrimination against Exel with the EEOC, nor that she had filed a lawsuit against the company. (Johnson Aff. ¶ 9; Perry Aff. ¶ 9; Davisson Aff. ¶ 10; Morton Aff. ¶ 8). They were also not aware that Plaintiff had a medical condition or that she had previously required leave from work pursuant to the Family and Medical Leave Act. (Johnson Aff. ¶ 9; Perry Aff. ¶ 9; Davisson Aff. ¶ 10; Morton Aff. ¶ 8).

## II. Summary Judgment Standard

Summary judgment is appropriate if the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The motion should be granted only if no rational trier of fact could return a verdict in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When ruling on the motion, the court views the record and all reasonable inferences in the light most favorable to the nonmoving party. *Heft v. Moore*, 351 F.3d 278, 283 (7th Cir. 2003). If the nonmoving party bears the burden of proof on an issue, that party may not rest on mere allegations or denials in its pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *See* FED. R. CIV. P. 56(e) ("If

a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . grant summary judgment . . . ."); *Silk v. City of Chicago*, 194 F.3d 788, 798 (7th Cir. 1999). The moving party need not disprove the nonmovant's case; rather, it may prevail by establishing the absence of evidentiary support in the record for the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

**III.    Discussion**

Plaintiff's Second Amended Complaint alleges that Wittenauer disclosed her medical condition to other Exel employees, including Morgan, and that, as a consequence, she was subjected to "heightened scrutiny and oversight by management." (Second Amended Compl. ¶ 22). Her Second Amended Complaint also alleges that she was subjected to disparate treatment and termination due to her disability, and was "retaliated against and suffered adverse employment actions because of her involvement in activity protected by Title VII." (*Id.* ¶¶ 32-33, 38).

    **A.    Confidentiality Claim under the ADA**

Plaintiff's first claim for relief, alleging that Wittenauer breached the confidentiality provisions of the ADA, was not addressed by Plaintiff in her response brief. Plaintiff's failure to respond to Exel's motion results in a waiver of her argument and an abandonment of her claim. *De v. City of Chicago*, 912 F.Supp.2d 709, 734 (citing *Palmer v. Marion Cnty.*, 327 F.3d 588, 597-98 (7th Cir. 2003) (deeming plaintiff's negligence claim abandoned because he failed to delineate it in his brief to the district court in opposition to summary judgment)). Accordingly, Exel's motion is granted with

respect to that claim. The court now turns to the merits of Plaintiff's Title VII retaliation claim and her ADA disability discrimination claim.

### B. Retaliation and Disability Discrimination

#### 1. Knowledge

In order to establish a claim for retaliation under Title VII, the decision-maker must have had actual knowledge that the plaintiff engaged in statutorily protected activity, such as filing a charge of discrimination with the EEOC. *See Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1122 (7th Cir. 2009) (citing *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 668 (7th Cir. 2006)). Whether the decision-maker could or should have known of the plaintiff's protected activity is insufficient. *Id*. (citing *Tomanovich*, 457 F.3d at 668); *Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004); *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1008 (7th Cir. 2000) ("an employer cannot retaliate when it is unaware of any complaints"). The same is true for disability discrimination claims – if the decision-maker did not know about the plaintiff's medical condition, then such condition could not have motivated the decision-maker to take action against the plaintiff. *See Hedberg v. Indiana Bell Tel. Co., Inc.*, 47 F.3d 928, 932 (7th Cir. 1995) ("At the most basic level, it is intuitively clear when viewing the ADA's language in a straightforward manner that an employer cannot fire an employee 'because of' a disability unless it knows of the disability. If it does not know of the disability, the employer is firing the employee 'because of' some other reason.").

The undisputed facts reflect that on November 28, 2011, Excel terminated Plaintiff's employment for accumulating eight attendance points in a single year.

9

Johnson, Perry, and Morton – the decision-makers in this case --  testified they were not aware that Plaintiff had previously filed charges of discrimination against Exel, and were not aware that she had filed a *pro se* Complaint in this court approximately six weeks before her termination.  They also testified they were not aware that she had a medical condition or that she had previously requested leave from work pursuant to the Family Medical Leave Act.  To Plaintiff's credit, it would seem, at the very least, that Johnson should have known of Plaintiff's charges and her *pro se* Complaint, since she was the Human Resources Manager of the Franklin Road facility.  As noted above, however, the standard is not whether the decision-maker *should have* known; rather, it is whether the decision-maker actually did know. There is no evidence to that effect.  Similarly, there is no evidence that Asset Safety and Security Manager Davisson, who scanned back the video to the time of Plaintiff's arrival at Johnson's request, knew of Plaintiff's protected activity or of her medical condition.

     Plaintiff argues that because (former) Human Resources Manager Wittenauer knew of Plaintiff's medical condition, knowledge may be imputed to the company.  In *David v. Caterpillar, Inc.*, the Seventh Circuit found that "the retaliatory motive of a 'nondecisionmaker' may be imputed to the company where the 'nondecisionmaker' influenced the employment decision by concealing relevant information from, or feeding false information to, the ultimate decisionmaker."  324 F.3d 851, 861 (7th Cir. 2003) (citation omitted).  In that instance, "'the [retaliatory] motive of the other employee, not the autonomous judgment of the nondiscriminating decision-maker, is the real cause of the adverse employment action.'"  *Id*. (quoting *Wallace v. SMC Pneumatics, Inc.*, 103

F.3d 1394, 1400 (7th Cir. 1997)). This reasoning applies with equal force to discrimination cases. *See Wallace*, 103 F.3d at 1400-01 (finding factual basis to impute knowledge of decision-maker in national origin discrimination case "has not been laid here").

Plaintiff has no evidence to support her belief that Wittenauer actually influenced, in any manner, the decision-makers in this case. *See, e.g., Brown v. Advocate South Suburban Hosp.*, 700 F.3d 1101, 1108 (7th Cir. 2012) ("[T]he plaintiff must produce evidence that a retaliatory motive actually influenced the decision-maker, not merely that it could have. . . ."). Instead, the evidence reflects that Wittenauer transferred to a different Exel facility in early 2011, approximately ten months before Excel terminated Plaintiff's employment, and did not otherwise inform anyone at Exel about Plaintiff's medical condition. (Wittenauer Dep. at 5-6, 9-10).

Next, Plaintiff argues that Fike and Winebrenner had knowledge of Plaintiff's condition due to Wittenauer's email, dated June 1, 2010, notifying them that Plaintiff had a lifelong condition requiring intermittent FMLA. As support, Plaintiff cites the fact that neither Fike nor Winebrenner could recall receiving the email. (Fike Dep. at 8-9; Winebrenner Dep. at 42, 62). According to Plaintiff, their failure to recall the email "smacks of an attempt to hide their knowledge." In order to draw the inference Plaintiff seeks, the court needs an evidentiary foundation to tie Fike's and Winebrenner's failure to recall with a motive to lie. Simply stating, in essence, that the court should not believe them is insufficient to carry her burden.

11

Lastly, Plaintiff argues that Exel knew about her protected activity because Plaintiff called the employee complaint hotline approximately four months prior to filing her first EEOC charge in January 2011, to complain, among other things, that Wittenauer had disclosed her medical condition to others. Again, Plaintiff has no evidence that the decision-makers in this case were aware of her call to the employee complaint hotline. Indeed, neither Human Resources Manager Johnson, nor General Manager Morton, were employed by Exel when Plaintiff made the call. (Morton Aff. ¶ 2; Johnson Aff. ¶ 2). Perry's name appears nowhere on the hotline investigation form, and no evidence otherwise supports that he was aware of Plaintiff's complaints made via the employee complaint hotline. (Plaintiff Aff., Ex. 1).

The evidence reflects that the decision-makers in this case did not have actual knowledge of Plaintiff's medical condition nor of her protected activity. On this ground alone, the court may grant summary judgment in favor of Exel. For the sake of completeness, the court will briefly address the merits of her claims.

### C. Merits of Title VII Retaliation and Disability Discrimination

A plaintiff may prove her Title VII retaliation claim and her ADA disability discrimination claim under the direct and indirect methods of proof. *Tomanovich*, 457 F.3d at 662 (Title VII retaliation); *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004) (ADA disability discrimination). Plaintiff proceeds under both methods of proof.

### 1. Direct Method

A retaliation claim under the direct method requires a plaintiff to show that: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse action. *Tomanovich*, 457 F.3d at 663. Where, as here, there is no direct evidence of intentional discrimination, the third element — a causal connection — may be established through circumstantial evidence. *Id*. Assuming a plaintiff is disabled and that her employer is covered by the ADA (the latter is not in dispute), a plaintiff's direct case of disability discrimination may also be established by circumstantial, rather than direct, evidence. *Buie*, 366 F.3d at 503.

To prevail under the direct method, the plaintiff's evidence must create "'a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker[s].'" *Phelan v. Cook Cnty.*, 463 F.3d 773, 779-80 (7th Cir. 2006) (quoting *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004)). Examples of the type of evidence contemplated under the direct method include "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent may be drawn." *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). Another example includes evidence that similarly situated employees outside of the protected group (pregnancy, sex, race, etc.) received systematically better treatment. *Id*. To prevail under this method of proof, Plaintiff's

13

circumstantial evidence "must point directly to a discriminatory reason for the employer's action." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003).

The court begins with Plaintiff's argument that the chronology of events after Perry took over as operations manager in June 2011, is "extremely suspicious." The events at issue include Perry's issuance of two Corrective Action Notices on November 23, 2011, just five days before Plaintiff's termination and three months after the filing of her *pro se* Complaint in this matter. The evidence reflects that the first Corrective Action Notice amended a Corrective Action Notice related to a violation that occurred on December 22, 2010, from a final written warning to a first written warning. The second Corrective Action Notice, dated November 23, 2011 for conduct that occurred on November 17, 2011, was issued because Plaintiff was talking to a co-worker, rather than working, during her scheduled shift. Had Exel not amended the Corrective Action Notice from December 2010, Plaintiff would have been subject to termination on November 23, 2011. Thus, the circumstances surrounding the amendment of the prior Corrective Action Notice strongly suggest the company's effort to keep Plaintiff employed, not a conspiracy to get rid of her. *See, e.g.*, *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 687 (7th Cir. 2010) (employee's positive evaluation months after complaint of sexual harassment "strongly suggests" employer's decision to fire employee was not motivated by employee's complaint).

Plaintiff also contends that Exel engaged in "ambiguous and inconsistent behavior" regarding the preservation of evidence. According to Plaintiff, Exel took steps to preserve evidence by issuing litigation hold letters in January and October 2011, yet

14

failed to identify to whom the letters were sent. (Defendant's Answer to Interrogatory No. 2). Plaintiff further observes that the October 2011 litigation hold letter "was sent in October 2011 . . . just one month prior to [Plaintiff's] termination." Even more telling, says Plaintiff, is the fact that the surveillance video of Plaintiff's arrival at work on November 28, 2011, and the video of her talking to a co-worker, dated November 17, 2011, "were destroyed as a result of Exel's intentional omission." In Plaintiff's opinion, "Davisson obviously knew the significance of the videos because he repeatedly attempted to retrieve them . . . but then he just gave up."

Plaintiff's Interrogatory No. 2, which asked Exel to describe the steps it has taken to preserve evidence in this case, did not ask to whom the letters were sent. (*See* Plaintiff's Interrogatory No. 2). Had Plaintiff sought that information, she could have asked Exel to supplement its answer. In addition, Plaintiff's reference to the litigation hold letter sent in October 2011, issued a month before her termination, fails to account for the fact that Plaintiff filed her federal lawsuit in late September 2011. And with regard to the missing surveillance videos, the undisputed evidence establishes that Davisson tried many times to save the surveillance videos related to this case, but was unable to download or save the videos on a disc or thumb drive. (Davisson Aff. ¶¶ 5, 8). Davisson's account is supported by Perry, who testified that the video was not able to be archived. (Perry Dep. at 43). Even Plaintiff acknowledges Davisson's repeated attempts to download the surveillance videos. Thus, contrary to Plaintiff's argument, there is no circumstantial evidence "the videos were destroyed due to Exel's intentional omission."

15

Next, Plaintiff cites a discrepancy in the testimony of Winebrenner and Perry regarding the fact that Winebrenner changed Plaintiff's clock-in time from 5:14 to 5:20. Winebrenner testified that Perry told her to change the time (Winebrenner Dep. at 57-58); Perry testified he could not remember telling her to do so (Perry Dep. at 33). Plaintiff contends Perry's lack of recall is "suspicious."

The undisputed evidence reflects that Perry viewed the video to determine Plaintiff's arrival time on her last day of work, and that doing so was normal procedure whenever an employee arrived late and failed to clock-in, as Plaintiff did. The purpose of the procedure was to find the actual arrival time for payroll purposes; thus, to the extent the time entered by Winebrenner in the timekeeping system differed from the actual arrival time, there is nothing suspicious about Perry directing Winebrenner to correct the time. Moreover, given the fact that the Exel facility employed hundreds of employees, the fact that Perry could not recall directing Winebrenner to correct the time is not suspicious.

Lastly, Plaintiff claims she is similarly situated to Renee Meulen, a first-shift cleaner with housekeeping duties, but that Meulen was treated more favorably than she. Plaintiff never raised this theory in her prior complaints or EEOC charges. Her pleadings thus far have been limited to alleged disparate treatment of her as compared to Polly Fowler, the cleaner on first shift who, like Plaintiff, was assigned to clean the warehouse and grounds. A plaintiff is not permitted to raise a new theory at the summary judgment stage, as Plaintiff did here. *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) ("a 'plaintiff may not amend his complaint through arguments in his brief in opposition to a

16

motion for summary judgment'") (quoting *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002))).

Even assuming Plaintiff did raise Meulen as a comparator in her pleadings, there is no evidence that Meulen is, in fact, similarly situated to Plaintiff. As noted above, Meulen was a first-shift cleaner with housekeeping duties. (Plaintiff Dep. at 93-94). Plaintiff sought and received a transfer from housekeeping duties to warehouse cleaning duties in the fall of 2010. (*Id.* at 63-65). As such, during the relevant period, Plaintiff and Meulen did not perform the same duties and so were not similarly situated. *See Hoffman-Dombrowski v. Arlington Int'l Racecourse, Inc.*, 254 F.3d 644, 651 (7th Cir. 2001) (comparators must hold same or equivalent position during relevant time).

For the reasons just stated, and for the reasons outlined in Exel's briefs, the court finds Plaintiff's evidence, taken together, fails to create a convincing mosaic of circumstantial evidence from which a jury could infer intentional retaliation or discrimination on the part of Exel. The court now turns to Plaintiff's indirect case.

### 2. Indirect Method

Under the indirect method of proof, a plaintiff must first establish a prima facie case. A prima facie case of retaliation requires a plaintiff to establish that: (1) she engaged in statutorily protected activity; (2) she was performing her job to her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Tomanovich*, 457 F.3d at 663. A prima facie case of disability discrimination requires a plaintiff to establish that: (1) she is disabled; (2) she is

able to perform the essential functions of the job either with or without reasonable accommodation; and (3) she suffered an adverse employment action because of her disability. *Majors v. General Elec. Co.*, 714 F.3d 527, 533 (7th Cir. 2013). Once a prima facie case is set forth under either claim, the burden of production shifts to the employer to present evidence of a non-discriminatory reason for the adverse employment action. *Id*. at 536; *Tomanovich*, 457 F.3d at 663. If the employer meets that burden, the burden shifts back to the plaintiff to establish that the employer's reason for the adverse action is pretextual. *Majors*, 714 F.3d at 536; *Tomanovich*, 457 F.3d at 663 (retaliation). Pretext is where her indirect case falters.

     Exel maintains it terminated Plaintiff because she was more than 15 minutes late to work on November 28, 2011, and therefore, met the eight-point threshold necessitating termination. Plaintiff, therefore, had the burden of proving Exel's (Johnson, Perry, and Morton) reason for Plaintiff's termination was a lie to cover up its discriminatory and/or retaliatory motive. *Harper v. C.R. England, Inc.*, 687 F.3d 297, 311 (7th Cir. 2012). In support of her pretext argument, Plaintiff again cites the disparity between the time recorded by the Asset Protection staff, 5:14 p.m., and the time recorded by the surveillance video, 5:20 p.m., and Perry's order directing Winebrenner to change Plaintiff's Log in time and official clock-in time. At most, Plaintiff raises the prospect that Exel's stated reason was mistaken and/or inaccurate. *Miller*, 203 F.3d at 1008 ("Pretext" is "more than a mistake on the part of the employer; pretext 'means a lie, specifically, a phony reason for some action.'") (quoting *Richter v. Hook-SupeRx, Inc.*, 142 F.3d 1024, 1029 (7th Cir. 1998))). She does not, however, "identify such

18

weaknesses, implausibilities, inconsistencies, or contradictions" in Exel's stated reason "that a reasonable person could find [it] unworthy of credence." *Harper*, 687 F.3d at 311 (internal quotations and citation omitted). Plaintiff's ADA disability discrimination and Title VII retaliation claims must, therefore, be dismissed.

### IV. Conclusion

For the reasons set forth above, the court **GRANTS** Exel's Motion for Summary Judgment (Docket # 49).

**SO ORDERED** this 16th day of August 2013.

_____
RICHARD L. YOUNG, CHIEF JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.